UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTINA JO MUZIO,

        Plaintiff,

v.                                         CASE NO. 3:20-cv-575-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

        Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for supplemental security income ("SSI"), alleging disability beginning February 23, 2011.  (Tr. 160.) Following an administrative hearing held on August 17, 2012, Administrative Law Judge ("ALJ") Edgardo Rodriguez-Quilichini issued a decision on September 13, 2012, finding Plaintiff not disabled since February 7, 2011, the date the SSI application was filed.[2]  (Tr. 15-50.)  Plaintiff appealed the denial of benefits and, on September 17, 2015, the United States District Court for

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 18.)

[2] The earliest time that SSI benefits are payable is the month following the month in which the application was filed.  (*See* Tr. 15 (citing 20 C.F.R. § 416.335).)

the Middle District of Florida, Orlando Division, reversed the Commissioner's final decision and remanded the case for further proceedings.  (Tr. 518, 520-25.)  In accordance with the remand order, on June 15, 2018, the Appeals Council vacated the Commissioner's final decision and remanded the case to an ALJ for further proceedings.[3]  (Tr. 530-31.)

After a supplemental administrative hearing held by video on December 12, 2018, ALJ Debra Bice issued a decision on June 3, 2019, finding Plaintiff not disabled since February 7, 2011.  (Tr. 449-60, 472-96.) Plaintiff is appealing the Commissioner's June 3, 2019 decision.  Plaintiff has exhausted her available administrative remedies and the case is properly before the Court.  Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.    Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389,

---

[3] The Appeals Council noted that Plaintiff filed a subsequent application for Title XVI disability benefits on April 7, 2015 and directed the ALJ to "consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims."  (Tr. 531.)

390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II. Discussion

Plaintiff raises four issues on appeal. First, she argues that the ALJ's decision to give only some weight to the opinions of her treating psychiatrist, Dr. Harish Kher, is contrary to law and unsupported by substantial evidence. (Doc. 20 at 11.) Plaintiff points out that Dr. Kher's opinions were consistent with his own records, with the other medical records and objective testing dating back to Plaintiff's hospitalization when she was eight years old, with

3

the non-medical records, and with the opinions of Anastasia Wells, Ph.D. and

Dr. Ted D. Mitchell.  (*Id.* at 15.)  Plaintiff notes that considering the ALJ's

mistaken reference to Dr. Kher as a "primary care provider," it cannot be

known if the ALJ would have looked more favorably on Dr. Kher's opinions if

she realized that Dr. Kher was a long-time treating specialist who was

treating Plaintiff in his area of expertise.  (*Id.* at 16.)

Second, Plaintiff argues that the ALJ's residual functional capacity

("RFC") assessment is not supported by law and by substantial evidence

because it does not address some of Plaintiff's most severe limitations,

including the effect of Plaintiff's obsessions (or so-called "special interests")

on her life and Plaintiff's need to be accompanied by a family member

anytime she leaves her home.  (*Id.* at 16-17.)  Plaintiff explains that while the

ALJ assessed some significant mental limitations, those limitations do not

address attendance, distraction, or the need for a support person.  (*Id.* at 17.)

According to Plaintiff, nothing in the record indicates that she could enter the

workforce without accommodations.  (*Id.*)  In addition, she points out that the

RFC assessment by ALJ Bice apparently adopted the RFC assessment by

ALJ Rodriguez-Quilichini, even though there were seven additional years of

evidence between the first and the second ALJ decision.  (*Id.* at 18.)  Plaintiff

states that much of the evidence in this case developed after the first

administrative hearing, including the records from Drs. Kher, Wells, and

Mitchell.  (*Id.*)

Third, Plaintiff argues that the ALJ's finding that she does not have an

impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments is contrary to law and unsupported

by substantial evidence.  (*Id.* at 19.)  She explains:

> Plaintiff's absolute inability to leave the house for errands,
> socialization, or other activities independently is, by definition,
> an extreme limitation.  To conclude otherwise is to ignore the
> evidence and to misapply the law.
> . . .
> The ALJ also observed that Plaintiff "was able to care for her
> grandmother."  This is an over-statement. . . .  Nothing indicates
> Plaintiff did anything more than stay at home with her
> grandmother.
> . . .
> Plaintiff's limitations more than satisfy the "B" criteria.

(*Id.* at 19-21, 23 (internal citations omitted).)

Finally, Plaintiff argues that the ALJ's decision should be reversed for

an immediate award of benefits.  (*Id.* at 23-25.)  Plaintiff explains:

> The ALJ has already considered the essential evidence.  The
> record contains 26 files of medical records, going back to 1996,
> when Plaintiff was a child.  The transcript contains a total of
> 1169 pages.  Further fact finding would reveal that Plaintiff
> continues to live with her brother and his family.  She continues
> to be unable to go anywhere without a family member, and she
> continues to have obsessions that keep her awake most of the
> night.  She continues to stay at home, and she continues to spend
> time on her computer.  She continues to have rigid requirements
> concerning such things as her clothing and hair style, and she
> continues to take her medication before she puts her glasses on in
> the morning and before she takes them off at night.
> . . .

> The current evidence overwhelmingly proves without a doubt
> Plaintiff is disabled.  It is difficult to imagine how more evidence
> could further inform the Commissioner about Plaintiff's
> condition.  Plaintiff has suffered an injustice.  This matter has
> been before the District Court twice, and this matter has been
> pending for 10 years.

(*Id.* at 24.)  Alternatively, Plaintiff requests a remand for further proceedings.

(*Id.* at 25.)

Defendant responds that substantial evidence supports the ALJ's

consideration of the opinion evidence of record, including the opinions of Dr.

Kher; substantial evidence supports the ALJ's RFC assessment; Plaintiff did

not carry her burden of proving that her impairments met the requirements

of Listings 12.06, 12.08, or 12.10; and Plaintiff has not established that she is

entitled to an award of benefits.  (Doc. 25 at 5, 9, 12-13.)

## A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when

making a disability determination.  *See* 20 C.F.R. § 416.920(a)(3).  With

regard to medical opinion evidence, "the ALJ must state with particularity

the weight given to different medical opinions and the reasons therefor."

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).

Substantial weight must be given to a treating physician's opinion unless

there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436,

1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)–(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also*

*Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[4] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

## B.   Relevant Medical Opinions

### 1.   Treating Source

On May 11, 2015, Harish Kher, M.D.[5] authored a letter to the Social Security Administration, stating:

> [Plaintiff] was initially seen in my office on 10/18/2013. Based on this evaluation, the following diagnosis [sic] was made: Depressive Disorder, nos, Anxiety Disorder, nos, Tourette's Syndrome, [and] Asperger's Syndrome. The patient was last seen in this office on 03/19/2015. Medications are listed as follows:

---

[4] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

[5] Dr. Kher is a Diplomat of the American Board of Psychiatry and Neurology and the American College of Forensic Examiners, and a member of the American Academy of Child & Adolescent Psychiatry and the American Academy of Psychiatry and Law. (Tr. 1072.)

> Deseryl 100mg 1 p.o.q hs #30
> Zoloft 100mg 1 ½ p.o. daily #45

(Tr. 1072.)

On December 1, 2015, Dr. Kher authored a similar letter to the Social

Security Administration, stating:

> [Plaintiff] was initially seen in my office on 10/18/2013. Based on
> this evaluation, the following diagnosis [sic] was made[:]
> Depressive Disorder, nos, Anxiety Disorder, depressed, Tourette's
> Syndrome, Asperger's Syndrome[,] [and] Panic Disorder with
> agoraphobia. The patient was last seen on 11/23/2015.
> Medications are listed as follows[:]
>
> Zoloft 100mg 1 ½ p.o. daily
> Deseryl 150mg 1 p.o.q hs

(Tr. 1095.)

On April 25, 2018, Dr. Kher authored another letter at Plaintiff's

counsel's request to provide a summary of her condition. (Tr. 1135.) The

letter stated, in relevant part:

> On the initial evaluation, [Plaintiff] was accompanied by her
> mother who also provided the background information on her.
> Ms. Muzio has been diagnosed with Asperger Disease/Autism
> Spectrum Disorder at a very young age. Around the age of seven,
> she was admitted to a children's hospital in Long Island, New
> York for what she described as "meltdowns." Apparently, she
> would have unprovoked angry outbursts resulting in destruction
> of property. . . . Since the initial evaluation, I have continued to
> follow her. Her depression/anxiety has responded well to a
> combination of Zoloft and Trazadone, which she had been taking
> prior to her initial evaluation with me. She was maintained on
> this per her and her mother's preference. She has tolerated this
> combination well.

9

Individuals with her type of disorder, i.e., Autism Spectrum
Disorder, have poor social skills, low frustration tolerance, [and]
high anxiety level.  They respond in an extreme fashion to any
real or perceived psychosocial stressor.  As such, they are very
limited in their interaction with others[,] more so in a work
environment.  Ms. Muzio is very limited in her ability to go out on
her own and requires [an]other person to be with her, which in
her case is her mother.  Many times, they obsess about certain
topics or activities and are unable to distract themselves from
these particular activities.  As such, it is difficult for them to
adhere to a work schedule or to comply with the requirements of
a job.  Taking all this into consideration, it is my opinion within a
reasonable degree of medical certainty that Ms. Muzio is
incapable of engaging in any gainful employment.

Ms. Muzio requires regular monitoring of her medication
regimen, as well as regular individual psychotherapy to help her
cope with psychosocial stressors in her life.

(Tr. 1135.)

## 2.   Examining Sources

### a.   Eve Carrington, Licensed School Psychologist, and Jennifer Friedman, Certified School Psychologist

On May 6, 2006, two school psychologists, Eve Carrington and Jennifer

Friedman, performed a psychoeducational evaluation of Plaintiff, who at the

time was an 18-year-old student at Timber Creek High School.  (Tr. 1146.)

The following background information was reported:

Ms. Muzio currently receives the following accommodations on
her individualized education plan: printed notes, extended time
for tests, assignments and projects, extra time to transition
between classes and class work broken down and assigned in
smaller segments.

10

> Ms. Muzio reports that she can sometimes be easily distracted. . . . [I]t takes her longer to complete things. . . . She has difficulty expressing her thoughts in speech, but not in writing. . . . She does experience an internal sense of restlessness and is bored easily. . . . She has difficulty falling asleep and takes medication in order to go to sleep. . . . She has perfectionistic tendencies. Ms. Muzio frequently looses [sic] or misplaces things and frequently changes interests or activities. . . . Ms. Muzio has difficulty estimating how much time is involved in a project. She tends to be very impatient and has a low frustration tolerance. . . . Ms. Muzio does not have difficulty following more than 2-step directions when the directions are simple; however, as the directions become more difficult, she has some difficulty.

(Tr. 1146-47.)

The following tests were administered: Wechsler Adult Intelligence

Scale – Third Edition (WAIS-III); Woodcock-Johnson Test of Achievement –

Third Edition (WJ-III Achievement); and Woodcock-Johnson Test of

Cognitive Ability – Third Edition (WJ-III Cognitive). (Tr. 1147-49.) The

following relevant summary was provided:

> During the evaluation, Ms. Muzio's level of attention and concentration were excellent and she persisted on all tasks through to completion. . . . On the administration of the WAIS-III, Ms. Muzio's overall ability fell within the Average range. Academic evaluation indicates Average reading and written language skills and Low math skills. A significant discrepancy is indicated between Ms. Muzio's ability level and her Broad Math score. Cognitive processing assessment indicates some level of weakness with perceptual speed, semantic processing speed and general sequential reasoning. Ms. Muzio's Broad scores in Processing Speed fell at least 15 points below her measured ability.
>
> As a result of Ms. Muzio's history of ESE [Exceptional Student Education] services, weaknesses in her processing speed and

reasoning skills, she will benefit from extra time on tasks to allow her to get the information stored on paper.  Repetition of material may be needed to get the information from short-term memory to long[-]term memory.  As a result of her low math skills, she will want to make use of a calculator so she can have her energies spent on the math process rather than the math computation.  A note taker may be beneficial due to her difficulties with processing information quickly.  It would be beneficial for her to make use of a tutoring lab to assist in her math skills and reasoning.

(Tr. 1150.)  The following diagnoses were assessed: mathematics disorder; previous diagnoses of OCD and social anxiety; and problems related to academics and history of services.  (*Id.*)

### b.   Michael Harrell, Ph.D.

On December 9, 2010, Dr. Harrell completed a seven-hour psychological evaluation of Plaintiff (who was 23 years old at the time) at the request of the State of Florida Department of Education, Department of Vocational Rehabilitation.  (Tr. 340.)  Plaintiff and her mother were the primary sources of background information.  (*Id.*)  Dr. Harrell recorded the following background information and observations:

At age 7, Christina was diagnosed with ADHD, but medication[s] were not effective.  She was later diagnosed with anxiety and hypersensitivity.

Christina reported her school behavior was variable and she often required "time out" and suspensions.  She was expelled from the 5th and 6th grades after moving to Orlando, and attended Gateway School until the 8th grade.  Christina later attended Timber Creek, and was in mainstream curriculums with better behavior.  She recalls being medicated for anxiety and behavioral

control, and had psychiatric supports.
. . .

Christina arrived on time for her appointment, driven by her
mother. . . .

Christina's mood was mildly depressed but she did not show
extremes of emotional tension, such as weeping. . . . Christina
indicates a history of extended mental health treatments with
psychiatric supervision but no hospitalizations. . . . Christina is
prescribed the following medications: Zoloft 150 mg (anxiety), and
Trazadone 100 mg (sleep aid).

Currently, Christina lives with her mother, grandmother, age 77,
and brother, Nick, age 21, in her mother's home. . . . Christina
has a valid driver's license, but prefers not to drive. She usually
travels with her mother, and remains at home. Christina has no
friends but has internet acquaintances with whom she
communicates. She reports problems with anxiety, withdrawal,
and denies depression.

(Tr. 340-42.)

Dr. Harrell administered the following tests: Wechsler Adult

Intelligence Scale – Revised (WAIS-R); Wide Range Achievement Test

(WRAT4); Millon Clinical Multiaxial Inventory (MCMI); and Rotter

Incomplete Sentences Blank (RISB). (Tr. 340.) The WAIS-R scores

suggested problems with academic learning, particularly mathematical

reasoning. (Tr. 343.) The WRAT4 scores suggested Plaintiff averaged

between a fifth-grade level for math and an eleventh-grade level of measured

academic skills, but did not meet the criteria for a specific learning disability.

(*Id.*) The MCMI scores indicated significant schizoid, dependent, and

obsessive features that were likely to affect her daily functioning.  (Tr. 344.)

As examples, Dr. Harrell cited Plaintiff's low self-esteem, anxiety and anger

as primary alternating feelings, difficulty forming relationships due to poor

social understanding and social skills, fear of making mistakes, poor

judgment, failure to incorporate societal norms, following peers into

maladaptive behavior, and/or compulsive behavior.  (*Id.*)  Plaintiff's RISB

testing revealed, in part:

> My nerves, "only come when I have to talk on the phone."  Other
> people, "don't understand that I am not bored when they talk,
> somehow they thing [sic] I am because my face looks bored."
> My mind, "sometimes goes off in its own world."  . . .  My greatest
> worry is, "my mother dying and being left alone."  . . .
>
> The RISB sentences suggest that Christina is a troubled person
> who is lonely and feels restricted by others.  She is observant and
> critical . . . .  Christina indicates much turmoil and dissatisfaction
> . . . .

(Tr. 344-45.)

Dr. Harrell diagnosed Asperger's disorder, mild, with anxious and

compulsive features; personality disorder, moderate, with schizoid,

dependent, and obsessive-compulsive features; severe obesity; and a GAF

score of 65.  (Tr. 345.)  His recommendations included the following:

> Christina will need supports for work adjustment, and may have
> difficulty finding an acceptable employment situation.
> It is also recommended that Christina apply for SSI benefits as
> an adult given her treatment history and lack of employment.
> This would be helpful particularly if she has future problems
> sustaining employment activities.  For Vocational Rehabilitation

eligibility, Christina has particular problems in the areas of self[-]direction, interpersonal skills, and work tolerance.  It does not appear that she will need special accommodations for employment activities, other than the possibility of a job coach.

(Tr. 347.)

### c.   William P. Friedenberg, Ph.D.

On August 25, 2015, Dr. Friedenberg, a licensed psychologist and a Director of the American Board of Forensic Examiners, performed a psychological evaluation of Plaintiff at the request of the Division of Disability Determinations.  (Tr. 1074.)  Plaintiff presented to the interview with her mother.  (*Id.*)  Dr. Friedenberg recorded the following pertinent background information:

> Ms. Muzio reported attending both special education and mainstream classes in school.  . . .  She has earned Associates degrees in general studies and film production, but only with extreme special accommodations, including having her mother staying nearby in case she felt overwhelmed.
> . . .
> Daily activities include watching TV, reading, and frequently going on her computer.  . . .  She has a pet cat she takes care of. Ms. Muzio stated that she has no friends with whom she socializes.  She reported generally having difficulty getting along with others due to her lack of social skills which result [sic] in verbal bluntness.  . . .  She stated that she is able to shop "by herself," although she must actually have a trusted companion with her to do so.

(Tr. 1074-75.)

During her examination:

[Plaintiff] elected to sit on the floor to "be more comfortable and

feel less constricted." . . . Ms. Muzio showed infrequent, mild facial and vocal tics. . . . Mood was reported to be chronically anxious, but no longer depressed, presumably due to antidepressant medication. . . . She did report falling apart emotionally when under stress due to changes in her environment or to over-stimulation. . . . Ms. Muzio reported having no specific phobias, although she did express a fear of her mother dying and her being left alone. She reported experiencing absence seizures periodically. . . . Ms. Muzio reported having difficulty with her memory for recent events. . . . Ms. Muzio was currently able to remember only 1 of 5 items presented orally after a mediated delay of five minutes. She was able to recall 7 digits forward and 4 backward. Overall memory and concentration are estimated from current data to be mildly impaired.

(Tr. 1075.) Dr. Friedenberg concluded:

Based on behavioral observations, provided mental health records, and reported history, current diagnosis is determined to be 299.80 Atypical Autism (Asperger's); with 300.3 Obsessive-Compulsive Disorder and 301.6 Dependent Personality Disorder; 278.01 morbid obesity, 780.52 chronic insomnia, 307.23 Tourette syndrome, and neck and back injury as reported medical problems. Ms. Muzio will likely have difficulty managing her own funds at the present time.

(*Id.*)

### d.   Anastasia Wells, Ph.D.

On November 30, 2015, Dr. Wells, a licensed psychologist, performed a psychological evaluation of Plaintiff. (Tr. 1090.) Dr. Wells recorded the following pertinent background information:

Christina Muzio is a single, twenty-eight[-]year[-]old woman who lives in Daytona with her mother and stepfather. . . . Her father works for US Customs in New York. Christina rarely visits with him and during a recent visit, she said that she had "meltdowns"

16

that involves [sic] "crying, irrational fears, can't communicate,"
etc. . . .
She is now requesting [vocational rehabilitation] assistance to
help her get trained as a physical therapist.
. . .
At this time, Christina said that her only household chore is to
feed "three cats."  "I used to clean up, but I injured my back and
I'm going for [physical therapy]."  She does not do her own
laundry or any cooking for herself.

(Tr. 1090-91.)

Dr. Wells made the following observations:

Christina Muzio presented as an upfront, talkative woman who
almost immediately rattled off all the symptoms that she has of
an Asperger's disorder as if she was reading them from a
textbook.  Although her mother was allowed to remain with her
during the initial interview, Christina rarely allowed her mother
to speak up.  Eye contact was adequate.  However, rapport with
her was marginal as there was a tendency for her to dominate the
session. . . .  Insight and practical reasoning were assessed to be
poor. . . .  During the session, she was well versed about all her
mental health issues and reported them in detail when
questioned.

(Tr. 1091.)

Dr. Wells performed a mental status examination and administered the

following tests: Wechsler Adult Intelligence Scale-IV (WAIS-IV); WRAT-4;

Incomplete Sentences, Personality Assessment Inventory (PAI); and Asperger

Syndrome Diagnostic Scale (ASDS).  (Tr. 1091-93.)  Plaintiff was diagnosed

with major depression, recurrent, in partial remission, and features of an

autism spectrum disorder, by history.  (Tr. 1093.)

Dr. Wells opined that Plaintiff's disabilities interfered with her ability

17

to work.  (*Id.*)  The potential for treatment success was guarded and depended on Plaintiff's ability to get involved in psychotherapy and process some of the defenses she might be using to avoid getting on with her life. (*Id.*)  The prognosis for competitive employment was also guarded and depended on how successful her psychotherapy was.  (*Id.*)  Dr. Wells concluded that Plaintiff had "the intelligence, basic skills, and computer abilities to obtain a wide variety of jobs at the entry and higher levels of work."  (*Id.*)

### e.  Dr. Ted D. Mitchell, MRC, EdS

On January 15, 2016, Dr. Mitchell performed a comprehensive vocational evaluation of Plaintiff and issued a twenty-five-page report based on a vocational interview; review of records, including, but not limited to, those from Dr. Kher and Dr. Wells; Purdue Pegboard (PP); WRAT-4; Slosson Intelligence Test – Revision 3 (SIT-R3); Strong Interest Inventory (SII); Dictionary of Occupational Titles, 4th Edition, Revised 1991 (DOT); Selected Characteristics of Occupations Defined in the DOT, 1992; 1991 Revised Handbook for Analyzing Jobs (RHAJ); Occupational Outlook Handbook (2010); O*Net; Bureau of Labor Statistics, Occupational Employment Statistics (OES); and Job Browser Pro/Occubrowse + SkillTRAN.  (Tr. 890-91, 896-902.)

Dr. Mitchell recorded the following pertinent history:

18

>Ms. Muzio is a 28-year-old female.  . . .  She currently lives with her mother and stepfather, in an apartment that they rent.

>. . . She reports that she has issues with her fine motor skills. "Sometimes I will break pencils when I'm writing, or I can't tie my shoes."
>. . .

>Ms. Muzio has an A.S. degree in film, and an A.A. degree in general studies from Valencia College.  She is currently working on earning her A.S. degree in physical therapy at Daytona State College.  "I want to be a physical therapist assistant."

(Tr. 891-92.)

>As to Plaintiff's daily activities, Dr. Mitchell noted:

>[Claimant's] mother assists her with shaving her legs.  "I can't maneuver the razor because of my motor skills."  . . .  She is able to perform some housework, but has difficulty pushing a vacuum or mopping.  . . .
>She reports that she is able to drive, but does not ever drive.  She has a valid license.
>. . .

>"I have motor tics and facial tics, so I don't drive just in case I swerve because of a tic."
>She utilizes public transportation.  "I started using Votran, but the medical one.  I can't do the regular bus."

(Tr. 893, 895.)

>As to Plaintiff's perception of her functional abilities, Dr. Mitchell

reported:

>Ms. Muzio is ambivalent about returning to work.  "I want to work, but because of my Asperger's my interest can change really quick and I have a hard time focusing.  For a long time, I loved film, and then it changed.  I can do promotional things, digital arts, medical things, and I'm really good at writing."

She believes that she would like to work part[-]time. "I can work with people, too. I would need days off for when I get my period, though. Sometimes my medicine doesn't work and I can't function. I can't work in a place like a factory or a place that has loud music. That's a sensory overload for me, but a hospital or school doesn't bother me. I can do medical stuff. I was my grandmother's care[-]taker."

Ms. Muzio was looking for jobs. "I stopped because they said I wasn't enthusiastic enough."

(Tr. 893.)

Dr. Mitchell observed that:

[Ms. Muzio] was nervous at first. Her mother stated[,] "she has problems with doctors because they don't understand, and she can't explain everything." . . .

Ms. Muzio spoke openly for the most part. At some point[], she became frustrated because she couldn't explain things as well as she wanted to. . . .

She is positive about her future vocational prospects.

She demonstrated functional abilities. She was very concerned about math. She wanted to make sure we know it's not that she chose to not finish math, it's that she didn't know how. She stressed that she has a math disability.

Ms. Muzio has a slow, normal gait. She has facial tics and breathes deeply.

(Tr. 895-96.)

As to Plaintiff's acquired skills and abilities, Dr. Mitchell stated, in

relevant part:

A psychological evaluation indicates that her disabilities do

20

> interfere with her ability to work.  The prognosis for competitive
> employment is guarded and would depend on how successful her
> psychotherapy was.  However, she does have the intelligence,
> basic skills, and computer abilities to obtain a wide variety of jobs
> at the entry and higher levels of work.

(Tr. 903.)  Dr. Mitchell then listed about two pages of job accommodations

that might be useful for accommodating Plaintiff's difficulty handling stress

and emotions, attendance issues, dealing with change, working effectively

with supervisors, interacting with coworkers, meeting deadlines and staying

organized, maintaining concentration, and managing distractions.  (Tr. 904-

05.)  He stated that Plaintiff might "be a good candidate for direct placement

in an unskilled occupation with the accommodations cited above."  (Tr. 905.)

Dr. Mitchell then listed four representative occupations that Plaintiff

could perform, including an addresser, a marker, a mail clerk, and a

surveillance-system monitor.  (Tr. 906.)  He opined that Plaintiff was not a

good candidate for training as a physical therapy assistant, but might be a

good candidate for training as a film laboratory technician if the standing

requirements were within her RFC, but noted that the job of a film laboratory

technician did not exist in significant numbers and placement might be

difficult.  (Tr. 909.)

Dr. Mitchell then listed three factors that negatively impacted

Plaintiff's employability:

1. Ms. Muzio reports, "I have to be really interested in something

21

or else I can't focus on it."  The ability to maintain
concentration, pace, and persistence at a competitive pace
(2hrs at a time) is a basic mental demand of work.  If she is
unable to meet this demand, Ms. Muzio will be unable to
sustain competitive employment.

2. Ms. Muzio reports she has trouble recognizing social cues.
The ability to respond appropriately to supervisors, coworkers,
and the general public is a basic mental demand of work.  If
she is unable to meet this demand, Ms. Muzio will be unable
to sustain competitive employment.

3. Ms. Muzio reports, "I would need days off for when I get my
period.  Sometimes my medicine doesn't work and I can't
function."  The ability to maintain a routine work schedule
and adhere to a specified work schedule is a basic mental
demand of work.  If she is unable to meet this demand, Ms.
Muzio will be unable to sustain competitive employment.

(Tr. 910.)

Dr. Mitchell did not list factors negatively impacting Plaintiff's place-

ability in the four representative occupations, but stated:

1. Ms. Muzio reports, "I can't do stuff where I would need to
stand.  I can't clean.  I can't do anything that requires me to
wear a uniform.  I can't work in a restaurant because I have a
fear of burning myself.  I can't touch certain fabrics, my hair
has to be above my ears, and I can't wear light colored pants.
I don't wear skirts or dresses."  Due to the uncommon nature
of these limitations, it will need to be confirmed with
prospective employers that none of these situations exist in
the workplace.

2. Records indicate the prognosis for competitive employment is
guarded and would depend on how successful her
psychotherapy was.  It is recommended that Ms. Muzio not be
placed in competitive employment until her treating
psychotherapist indicates that Ms. Muzio has met her
psychotherapeutic goals.

(*Id.*)

22

Dr. Mitchell then listed the following impediments to employment:

1. [Ms. Muzio] [h]as problems interviewing and completing job applications.
2. [She] [h]as problems [] concentrat[ing], remembering things, learning new things, recalling land[-]marks, and making changes.
3. [She has] [p]roblems [] interact[ing] with others and inability to read facial expressions.  She does not like to talk on the phone and doesn't like changes in routine.
4. She cannot wear skirt[s] or dresses.
5. [She has] [p]roblems with mobility.
6. She can't sit or stand for long periods of time.

(Tr. 911.)

Dr. Mitchell opined that Plaintiff might be a good candidate for direct placement in an unskilled occupation with accommodations.  (Tr. 913.)  He noted that Plaintiff had no difficulty maintaining attention and concentration during the three-hour evaluation and seemed to have the ability to tolerate a full day of work with normal and customary breaks.  (*Id.*)  However, when asked if Plaintiff was employable in part-time or full-time work, Dr. Mitchell responded that she was capable of part-time work.  (*Id.*)  Dr. Mitchell stated that his opinion was made to a reasonable degree of certainty and was supported by the objective information, such as test results, physical limitations, attitudes, behavior, and labor market information.  (Tr. 914.)

### 3.    State Agency Non-Examining Sources

#### a.    J. Patrick Peterson, Ph.D., J.D.

On April 22, 2011, based on a review of available records, Dr. Peterson

completed a Psychiatric Review Technique ("PRT") form, opining, in relevant part, that Plaintiff had an adjustment disorder with anxious features and a personality disorder.  (Tr. 371, 373.)  Dr. Peterson also opined that Plaintiff had a mild limitation in activities of daily living and in maintaining concentration, persistence, or pace, and a moderate limitation in social functioning.  (Tr. 376.)

The same day, Dr. Peterson also completed a Mental RFC Assessment, opining, in part, that Plaintiff was moderately limited in the ability to: maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others.  (Tr. 380-81.)  Dr. Peterson explained:

> [Claimant] [c]urrently still resides semi-independently [with] her mother [and] continues to function at least minimally adequately in a full range of routine [activities of daily living] [within] her motivational/volitional parameters, including shopping, limited food prep[aration], financial matters, [and] entertaining plans to continue her education, as well as enjoying music, reading, [and] using her [personal computer], etc.; she may likewise be considered still capable of sustaining the mental demands of appropriate concentrated task-oriented activity at this time as well.

(Tr. 382.)

### b.    John Thibodeau, Ph.D.

24

On July 28, 2011, Dr. Thibodeau reviewed all evidence in the file as of that date, and affirmed Dr. Peterson's April 22, 2011 PRT and Mental RFC Assessment as written.  (Tr. 389.)

### c.    Lee Reback, Psy.D., P.A.

On August 27, 2015, Dr. Reback completed a PRT form, opining that Plaintiff had moderate restrictions in activities of daily living, in maintaining social functioning, and in concentration, persistence, or pace.  (Tr. 558.)  The same day, Dr. Reback also completed a Mental RFC Assessment, opining, in part, that Plaintiff was moderately limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; and set realistic goals or make plans independently of others.
(Tr. 561-62.)  Dr. Reback explained:

> Given the information available for review[,] the claimant appears to have the mental capacity to perform daily and routine activities.  She would probably do best in a stable work environment that provided her with clear work-related goals and limited interpersonal demands.

(Tr. 562.)

### d.    Pamela D. Green, Ph.D.

On December 11, 2015, Dr. Green completed a PRT form, opining that Plaintiff had moderate restrictions in activities of daily living, in maintaining

social functioning, and in concentration, persistence, or pace.  (Tr. 572.)  The same day, Dr. Green also completed a Mental RFC Assessment, opining, in part, that Plaintiff was moderately limited in the ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact appropriately with the general public; and set realistic goals or make plans independently of others. (Tr. 577-79.)  Dr. Green explained:

> Given the information available for review[,] the claimant appears to have the mental capacity to perform daily and routine activities.  She would probably do best in a stable work environment that provided her with clear work-related goals and limited interpersonal demands.

(Tr. 579.)

## C.    The ALJ's Decision

At step two of the sequential evaluation process,[6] the ALJ found that Plaintiff had the following severe impairments: obesity, Asperger's syndrome, dependent personality disorder, obsessive-compulsive disorder ("OCD"), Tourette's syndrome, and depression.  (Tr. 452.)  Then, at step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed

---

[6] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 416.920(a)(4).

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §

416.920(d), § 416.925, and § 416.926), and, more specifically, of Listings

12.06, 12.08, and 12.10.  (Tr. 453.)  The ALJ determined that Plaintiff had

mild limitations in understanding, remembering, or applying information

and in adapting or managing oneself; and moderate limitations in interacting

with others and in concentrating, persisting, or maintaining pace.  (*Id.*)

     Before proceeding to step four, the ALJ found that Plaintiff had the

RFC to perform light work, except:

> [S]he cannot climb ladders, ropes, and scaffolds.  In addition, the
> claimant can only occasionally climb ramps and stairs,
> occasionally balance, stoop, kneel, crouch and crawl; and she
> should avoid exposure or work in hazardous environments.  The
> claimant is limited to simple job tasks with few[,] if any[,]
> changes in the routines or work processes.  She should have no
> contact with the general public; occasional superficial interaction
> with coworkers and supervisors; no work on team projects; and
> no work involving assembly line pace or strict quota or
> production standards.

(Tr. 454.)  In making this finding, the ALJ considered Plaintiff's hearing

testimony, the treatment records, the objective medical evidence, and the

opinion evidence from the treating, examining, and non-examining sources.

(Tr. 454-58.)

     For example, the ALJ addressed Dr. Kher's opinions as follows:

> The [ALJ] considered statements from Harish Kher, M.D., the
> claimant's primary care provider, who described the symptoms
> that accompany persons with diagnoses similar to the claimant
> and noted that she is very limited in her ability to go out on her

27

own and requires another person to be with her, which in her case is her mother.  In addition, Dr. Kher found that the claimant is incapable of engaging in any gainful employment, and that she requires regular monitoring of her medication regimen, as well as regular individual psychotherapy to help her cope with psychosocial stressors in her life (21F; 24F).  The [ALJ] gives this opinion some weight, as the claimant was seen monthly by Dr. Kher and he prescribed her medications.  However, the treatment notes indicate the claimant's depression and anxiety are stable.  Furthermore, the [ALJ] provided limitations in the claimant['s] [RFC] that take into consideration her symptoms of obsessive thoughts and trouble handling change.  The claimant's need to have another person with her, such as her mother, is not established in the medical record and not noted by other examining or reviewing physicians.  Moreover, the claimant's testimony indicates that while she relies heavily on her mother's support[,] she is able to perform tasks independently.  Finally, the determination of disability is an issue reserved for the Commissioner of Social Security.

(Tr. 457.)

The ALJ then addressed Dr. Wells's statement that Plaintiff's

disabilities interfered with her ability to work:

Dr. Wells concluded that the claimant's prognosis for competitive employment is guarded and would depend on how successful her psychotherapy was.  As noted, the claimant's medical treatment, including psychotherapy, is minimal [no cure for autism].  Nonetheless, Dr. Wells assessed that the claimant has the intelligence, basic skills, and computer abilities to obtain a wide variety of jobs at the entry and higher levels of work (20F).  The [ALJ] gives this opinion some weight, though based on a one-time examination, the opinion is largely consistent with the evidence as a whole and supported by the objective medical evidence.

(*Id.*)

The ALJ also considered the third-party statements in the record,

28

including those by Plaintiff's mother:

> While these statements and opinions are generally consistent
> with the existence of the claimant's symptoms and limitations as
> established by the objective evidence, they are not consistent in
> terms of the severity of those symptoms and limitations . . . .
> Accordingly, the [ALJ] assigns the claimant's mother's opinions
> limited weight, as the record suggests that the claimant's
> limitations are not as severe as her mother reported and that the
> claimant is capable of work as reflected in the above [RFC].

(Tr. 458.)

Further, the ALJ gave "limited weight" to the State agency

psychological consultants' assessments in Exhibits 7A and 10A because,

despite their consistency with the medical evidence, the evidence indicated

that Plaintiff should avoid work with strict pace or production standards.

(Tr. 456.)

Then, the ALJ addressed Plaintiff's subjective complaints in relation to

the other evidence in the record:

> After considering the claimant's treatment record, the medical
> opinion evidence, and the activities of daily living, the [ALJ] also
> considered whether the claimant's allegations are consistent with
> the medical evidence and the other evidence in the record.  After
> careful consideration of the evidence, the [ALJ] finds that he
> claimant's medically determinable impairments can reasonably
> be expected to cause the alleged symptoms.  However, the
> claimant's statements concerning the intensity, persistence, and
> limiting effects of the symptoms are not entirely consistent with
> the medical evidence of record.  Based on the objective evidence
> in the record, the claimant's activities of daily living, and her
> treatment record, the [ALJ] finds that the claimant is capable of
> performing [the] above[-]stated [RFC].

29

(Tr. 458.)

ALJ Bice also noted the conclusions reached by the prior ALJ regarding

Plaintiff's RFC as follows:

> [ALJ] Rodriguez-Quilichini found that the claimant had the
> [RFC] to perform light work . . . .  The claimant is limited to
> simple, routine, and repetitive tasks, with no interaction with the
> public and occasional interaction with coworkers and . . .
> supervisors.  Notably, the Appeals Council did not find error with
> the [RFC] found nor did the District Court disturb this [RFC]
> assessment (3A, 6A).

(Tr. 456-57.)

Then, at step four of the sequential evaluation process, the ALJ

determined that Plaintiff had no past relevant work.  (Tr. 458.)  At step five,

considering Plaintiff's age,[7] education, RFC, work experience (or lack

thereof), and the testimony of the vocational expert ("VE"), the ALJ

determined that there were jobs existing in significant numbers in the

national economy that Plaintiff could perform, such as a merchandise

marker, a photocopying machine operator, and a routing clerk, all of which

are light, unskilled jobs with a Specific Vocational Preparation ("SVP") of 2.[8]

---

[7] Plaintiff was born in 1987.  (Tr. 458.)

[8] The ALJ also asked the VE about whether there were jobs existing in
significant numbers in the national economy that Plaintiff could perform under the
prior RFC assessed by ALJ Rodriguez-Quilichini, and the VE responded
affirmatively, listing the following representative occupations: an assembler, an
inspector, and a toy stuffer, all of which are light, unskilled jobs with an SVP of 2.
(Tr. 459.)

(Tr. 458-59.)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ improperly evaluated the opinion evidence and her RFC assessment is not supported by substantial evidence.  In giving Dr. Kher's opinions some weight, the ALJ noted that Dr. Kher saw Plaintiff monthly and prescribed her medications.  (Tr. 457.) However, the ALJ improperly discounted Dr. Kher's opinion that Plaintiff was very limited in her ability to go out on her own and required another person to be with her, which in her case was her mother.  (*Id.*)  The ALJ stated that Plaintiff's need to have another person with her, such as her mother, was not established in the medical record and not noted by other examining or reviewing physicians.  (*Id.*)  The ALJ also stated that despite Plaintiff's testimony that she relies on her mother's support, Plaintiff was able to perform tasks independently.  (*Id.*)  The ALJ's statements are not supported by substantial evidence in the record.

Plaintiff's need to have a companion when she leaves her home and her lack of independence are well-documented in the medical record, including in

the records of treating and examining physicians.[9]  (*See, e.g.*, Tr. 1074-75

("[Plaintiff] has earned Associates degrees in general studies and film

production, but only with extreme special accommodations, including having

her mother staying [sic] nearby in case she felt overwhelmed.  . . .  She stated

that she is able to shop 'by herself,' although she must actually have a

trusted companion with her to do so."); Tr. 340-42 ("She usually travels with

her mother, and remains at home."); *cf.* Tr. 347 (noting that Plaintiff would

possibly need a job coach as a special accommodation for employment

activities).)

    As shown by the progress notes from her treating providers, Plaintiff

---

[9] The Function Reports completed by Plaintiff, her mother, and her grandmother, as well as Plaintiff's testimony at the two administrative hearings consistently demonstrate Plaintiff's lack of independence and need to have a companion when leaving her home.  (*See* Tr. 188 (noting on March 24, 2011 that Plaintiff needed someone to accompany her when going places); Tr. 197 (noting on April 11, 2011 that Plaintiff could not go out alone because she was afraid to do so and her mother had to be at her side); Tr. 207-08 (noting on April 11, 2011 that Plaintiff could not go out alone and needed someone to accompany her); Tr. 35 & 44-45 (stating on August 17, 2012 that Plaintiff's mother had to sit in the parking lot while Plaintiff was attending college classes and she could not use public transportation alone or go grocery shopping alone); Tr 804-05 (noting on May 3, 2015 that Plaintiff could not go out alone due to high anxiety, poor social skills, and poor navigation skills, and that the only place that she could go by herself was around her apartment complex); Tr. 826 (noting on October 15, 2015 that Plaintiff could not go out alone due to her anxiety and inability to drive as a result of motor tics); Tr. 818 (noting on October 15, 2015 that Plaintiff needed someone to accompany her when leaving her home); Tr. 480-81 & 483-84 (stating on December 12, 2018 that Plaintiff was dependent on her family for everything, she did not leave her home alone even to go for a walk, she was unable to take public transportation alone because she got confused and could not talk to people, her mother had to sit in the parking lot of her college while Plaintiff was in class, and Plaintiff could not have gone to her classes without her mother being there).)

was accompanied by her mother at all of her visits and her mother was actively involved in her treatment.  (*See, e.g.*, Tr. 385, 438, 1080, 1100-32, 1152.)  Plaintiff was also accompanied by her mother at the evaluations by Drs. Harrell, Friedenberg, Wells, and Mitchell, where both Plaintiff and her mother were the primary sources of information.  Further, when Plaintiff had a hard time explaining her condition to the doctors, her mother would step in to clarify.  (Tr. 895.)  Understandably, Plaintiff often reported that her greatest fear was her mother dying and leaving her alone.  (Tr. 344, 1075, 1124.)  Although the reviewing physicians did not examine Plaintiff, Dr. Peterson observed that Plaintiff "still reside[d] semi-independently [with] her mother."  (Tr. 382.)

To the extent the ALJ stated that she took into account Plaintiff's symptoms of obsessive thoughts and trouble handling change when determining the RFC assessment, these symptoms are independent from Plaintiff's inability to leave her home alone.  Also, while the ALJ stated that Plaintiff's depression and anxiety were stable on medication, this was a separate issue from Plaintiff's need to have a companion when leaving her home.  As Dr. Kher explained, Plaintiff's inability to leave her home alone was related to her diagnosis of Autism Spectrum Disorder ("ASD") (or Asperger's Syndrome, also known as high-functioning Autism), for which there is no known cure or one standard treatment.  As such, even if Plaintiff's

symptoms of anxiety and depression were relatively stable on medication, that does not necessarily imply that Plaintiff's other symptoms and limitations from her many diagnoses were also stable enough to permit full-time gainful employment.  The record indicates that Plaintiff continued to rely on family members for all of her needs and she continued to experience many irrational fears and anxiety.  (*See, e.g.*, Tr. 288, 290, 388, 1112, 1117, 1120, 1127, 1131, 1152.)  It also seems immaterial whether Plaintiff's medical treatment, including psychotherapy, was minimal, as the ALJ noted (Tr. 457), when there is no standard treatment for ASD.

Finally, Plaintiff correctly points out that the ALJ mistakenly referred to Dr. Kher as a "primary care provider," when in fact he was Plaintiff's long-time treating psychiatrist.[10]  As such, the Court can only speculate whether the ALJ would have given more weight to Dr. Kher's opinions if she had realized that he was a specialist who treated Plaintiff in his area of expertise. Based on the foregoing, the Court cannot conclude that the ALJ properly evaluated the opinion evidence and that her RFC was supported by substantial evidence.  In light of this conclusion, the Court need not address

---

[10] Dr. Kher is a Diplomat of the American Board of Psychiatry and Neurology and the American College of Forensic Examiners, and a member of the American Academy of Child & Adolescent Psychiatry and the American Academy of Psychiatry and Law.  (Tr. 1072.)

Plaintiff's remaining arguments, except the final argument for an immediate award of benefits.[11]  *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008).  The Court determines that this case should be reversed and remanded for further proceedings rather than for an immediate award of benefits.  However, the Court will require expedited review and regular status reports as stated below, given the length of time Plaintiff's case has already taken and the severity of her impairments.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) and § 1383(c)(3), with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the medical evidence and opinions from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.     Because of the length of time Plaintiff's case has already taken and the severity of her impairments, the Commissioner is directed to expedite the review of Plaintiff's claim.

---

[11] It should be noted that the ALJ erred in adopting ALJ Rodriguez-Quilichini's RFC assessment, which was rendered seven years prior to the second ALJ decision and before records from Drs. Kher, Wells, and Mitchell became a part of the file.

3.      The Clerk of Court shall enter judgment accordingly, terminate any other pending motions, and close the file.

4.      Notwithstanding the closure of the file, counsel for the Commissioner is directed to file a status report advising of the progress of Plaintiff's claim in the administrative process, with the first report due on **February 14, 2022**, and subsequent reports due **every 60 days** thereafter.

5.      In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on October 8, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record